HELENA WHOLESALE GROCERY COMPANY *v.* INTERSTATE GROCER COMPANY.

4-5115

Opinion delivered June 13, 1938.

*Burke, Moore & Walker,* for appellants.

*W. G. Dinning,* for appellee.

MEHAFFY, J. There were two suits pending in the Phillips circuit court, one by the Helena Wholesale Grocery Company and the other by the Helena Wholesale Dry Goods Company and Milan Wilkes, against Interstate Grocer Company. These suits were consolidated for trial, the parties waiving a jury, and the cases were tried by the court sitting as a jury.

The Helena Wholesale Grocery Company and the Helena Wholesale Dry Goods Company each sold to Wilkes under what they claimed to be a conditional sales contract, claiming that title was retained in the sellers. The Interstate Grocer Company had sold goods to Wilkes and brought suit and caused an attachment to be levied on the stock of merchandise of Wilkes. The stock of merchandise included goods that Wilkes had purchased from appellants.

F. C. Wilkes had been engaged for several years in the general merchandise business in various places in Phillips county and his brother, Milan Wilkes, appellant, was in business with him. In December, 1935, F. C. Wilkes closed his other places of business and moved to a country store at Hoops Spur, near Elaine. F. C. Wilkes was indebted to the Interstate Grocer Company; and also to the Helena Wholesale Dry Goods Company. He had not done business with the Helena Wholesale Grocery Company in more than a year, and was not indebted to it at the time he moved to Hoops Spur. Shortly after moving, F. C. Wilkes returned to his former home in Mississippi and placed his business in charge of his brother, appellant Milan Wilkes.

Milan Wilkes testified that the agreement under which he took over the business was that he should assume F. C. Wilkes debts and work them out, after which he would be the sole owner of the business. Immediately after taking charge of the store he made a lease contract with Hornor Brothers, the owners of the building, giving his individual notes for the rent, and put up a sign on the store bearing his name. Witness notified the creditors of F. C. Wilkes that he had assumed the debts and the Helena Wholesale Dry Goods Company then changed the account to his name and sold him additional goods.

The Interstate Grocer Company denied changing the account, but admitted that after notice of the change in ownership they continued for three months to sell Milan Wilkes goods in his own name for cash, but refused him credit.

Beginning about April 30, 1936, the Helena Wholesale Grocery Company began to sell to Milan Wilkes and did not know F. C. Wilkes in the transaction in any way.

The only question for our determination is whether the conditional sales contracts are valid against the attachment of a pre-existing creditor of the purchaser.

Both appellant companies claim the right to repossess goods sold by them under the contract which they claim is a title retaining contract.

E. P. Moore testified in behalf of the Interstate Grocer Company in substance as follows: that he was president and manager of the Interstate Grocer Company, and had been since 1913; that the company did business with F. C. Wilkes in three places in Phillips county and sold him merchandise during 1935 and some in 1936; that F. C. Wilkes left Arkansas and went to Mississippi; that at the time he went to Mississippi he was indebted to the Interstate Grocer Company, and that indebtedness now amounts to $630.86; that after F. C. Wilkes left the state, witness caused an attachment to be issued and levied against the property involved in this suit and credited the account with $25 that the property brought and $8.50 for shoes that were sold; that the credits were for goods that were not claimed by either of appellant companies;

that the last item on the statement was January 7, 1936; these were the last goods sold to Frank Wilkes, and they refused to sell to Milan Wilkes except for cash; the attachment was filed some five months after Frank Wilkes left the county; that the Interstate Grocer Company got possession of all the goods taken by the sheriff except those claimed by the Helena Wholesale Dry Goods Company; that he knew of the claim of the Dry Goods Company; that Mr. Faulkner, president of the Helena Wholesale Grocery Company told witness that he claimed the goods under a written title-retained contract; that he refused to deliver the goods claimed by the wholesale grocery company to it, and the goods stayed around the place in the dust and dirt and deteriorated; that he refused to surrender the goods voluntarily.

Milan Wilkes testified in substance that about December 1, 1935, F. C. Wilkes left and witness took over the store; that at the time F. C. Wilkes owed the Interstate Grocer Company and the Helena Wholesale Dry Goods Company; that witness operated the store in his own name and signed notes for the lease individually; he did business with the Interstate Grocer Company until they refused to sell him; that in the early part of 1936 Mr. Earl Moore and Mr. Watt Moore came down to see him and told him they did not want him to go out of business, but to go ahead and pay out, and after that time they sent him groceries; at the time the attachment was issued he had just bought groceries from the Helena Wholesale Grocery Company, and at that time had some few groceries which he had obtained from the Interstate Grocer Company, but not many; the majority of the goods came from the Helena Wholesale Grocery Company; they were sold to him individually; the Helena Wholesale Dry Goods Company had sold him goods and there were no liens on the property; that he had inventory of the goods which were his property and opposite was the retail price. The inventory was here introduced. The fixtures were also levied on and taken; that the fixtures were his property and the value was $500; the property claimed by Helena Wholesale Grocery Company amounted to $392 and if allowed to sell at retail his profit

would be around $90, and his profit on the goods of the Helena Wholesale Dry Goods Company would be around $63; when he took over the business he agreed to pay the Helena Wholesale Dry Goods Company the account owed them by F. C. Wilkes; F. C. Wilkes at that time did not owe the Helena Wholesale Grocery Company anything and he did not do any business with them until after he had taken over the business in his own name; that he bought from the Helena Wholesale Dry Goods Company and the Helena Wholesale Grocery Company with the understanding that the goods were purchased under a contract by which title was retained in the seller until they were paid for; that it was written on the bill; that when F. C. Wilkes left he had closed his other places of business, and they only operated the business at Hoops Spur; witness was left in charge of the business at Hoops Spur with the understanding that he would take it and pay it out of debt; F. C. Wilkes did not give him any bill of sale and he did not pay F. C. Wilkes anything for it; the business was just turned over to him to pay the debt and he tried to do that. He did not pay the debt and owes the Interstate Grocer Company $600. Some part of the goods bought from the Helena Wholesale Dry Goods Company might have been bought by F. C. Wilkes; he could not separate the goods; he bought some from William R. Moore and paid for them out of the stock; he sold the stock of merchandise belonging to F. C. Wilkes and used the money to pay William R. Moore Dry Goods Company; witness claims the goods as his property; witness could not pick out from the list the goods that were bought from William R. Moore and those bought from the Helena Wholesale Dry Goods Company; the display case and cash register had been paid for; the Interstate Grocer Company agreed with him to go ahead and work out the indebtedness and he tried to do this; after he worked it out the property was supposed to be his; he was not claiming any dry goods as his own except some shoes; he also claimed some medicines and other things on the list. After he went into possession of the property he bought merchandise from the Interstate Grocer Company, the Helena Wholesale

Grocery Company and from Raff; he had not been buying from the Helena Wholesale Grocery Company until about the last month, and had not paid this company anything; he was using the money that was taken in to buy more groceries, pay on his debts, and to live on. It was four or five months after he took over the business before the attachment was levied, he did not attempt to comply with the bulk sales law and did not know what it was.

W. A. Peel testified in behalf of the Helena Wholesale Grocery Company in substance that in May, 1936, he made an inventory of the Wilkes stock of goods sold by the Helena Grocery Company; the inventory was introduced and contains an itemized list of the goods in stock and their value, totaling $392.95; the inventory was made on the day the attachment was levied and the goods were the only ones sold to Milan Wilkes by the Helena Wholesale Grocery Company, in his possession; one inventory was a list of Milan Wilkes' whole stock and the other a list of the stock belonging to the Helena Wholesale Grocery Company; when he took the inventory most of the goods were still in the cases with the Helena Wholesale Grocery Company's name on them; some of the goods had been put out on the shelves; witness did not know who else Milan Wilkes was buying from; the amount of goods claimed by the Helena Wholesale Grocery Company, which could be identified is, $300.

T. H. Faulkner testified in behalf of the Helena Wholesale Grocery Company that it was understood the title was to be retained by the seller, and that each of the invoices contained the following: "Terms: It is expressly agreed and understood between seller and purchaser that the title to goods mentioned in this invoice is to remain vested in the Helena Wholesale Grocery Company until fully paid. Interest charged on past due accounts." Witness then testifies to the amount of the indebtedness and the inventory made by Wilkes. This witness testified at length, but since the only question involved is the conditional sales contract, it is unnecessary to copy his testimony on other matters.

F. F. Kitchens, the sheriff, testified that he received a letter notifying him of the interest of the Helena Wholesale Grocery Company and he notified the attorney for the Interstate Grocer Company.

Alvin Solomon testified in behalf of the Helena Wholesale Dry Goods Company that the terms on which merchandise was sold were as follows: "'The Helena Wholesale Dry Goods Company retains the title and right to possession of all goods on this invoice and the proceeds arising from the resale thereof in the ordinary course of the retail business, until paid in full, and reserves the right of segregating and taking its goods out of any stock of merchandise when necessary for its protection in the collection of its debt." Witness testified that he had no agreement with either Frank or Milan Wilkes except as stated on the invoice; that he called their attention to that agreement but did not require them to keep the merchandise apart from their general stock or to distinguish the proceeds from the balance of the stock; when Wilkes made a payment it was applied on the old account, but they considered them both the same account; he did not require either of the Wilkes to keep the proceeds of a sale separate and send it to him.

There was a separate judgment in each case. The court, sitting as a jury, held that the claim of title asserted by each, the Helena Wholesale Dry Goods Company and the Helena Wholesale Grocery Company, was denied and the attachment was sustained. To reverse these judgments this appeal is prosecuted.

The rule is well settled in this state that where one sells property to another, retaining the title thereto until the goods are paid for, this is a conditional sale and the title does not pass until the condition is performed. Ordinarily when property is sold under a conditional sales contract with the agreement that the title shall not pass until the purchase price is paid, if the purchase price is not paid the seller has a right to retake his property. But this, of course, depends upon whether or not there was a conditional sales contract; whether there was an agreement between the seller and the buyer that title should remain in the seller until the goods were paid for.

The evidence in this case shows that there was printed on the invoices the statement above set out as to retaining title, but there is no evidence in the record that this statement was signed by anyone and certainly it could not become a contract without being signed. It is true that the parties might make a verbal contract by which the seller retains title, and Wilkes testifies that it was his understanding that the seller retained title, but he does not claim that the seller ever told him this. We think his evidence shows that he was talking about the statement printed on the invoices, because he said it was a written agreement, and there is no written statement with reference to the sale of the goods except that printed on the invoice. It appears from the evidence that the seller sold the goods purchased from each of appellant companies and used the money as he wished and was never at any time required to account to the seller for the proceeds after he had sold the property.

The first case cited and relied on by appellants is *Triplett* v. *Mansur & Tebbetts Implement Co.*, 68 Ark. 230, 57 S. W. 261, 82 Am. St. Rep. 284. The court said in that case: ''According to the contract of the parties, if the goods were sold by McGaughy, they were to be sold as the property of appellee, and the proceeds of the sale were to be and remain the property of the appellee. Such an agreement is valid.''

There was no such agreement in this case. It is not contended that the property was to be sold as appellants' property and the proceeds paid over to them. There is no evidence in the case tending to show this.

It is not a question here as to the right of the seller where there is a conditional sales contract, but whether in this case the evidence shows that there was such a contract.

Attention is next called to the case of *Sternberg* v. *City National Bank of Ft. Smith,* 149 Ark. 432, 233 S. W. 691. That case announces the same rule with reference to rights of the seller where there is a conditional sales contract, but in that case a note was given in which the statement was made that the buyer had a right to sell and

apply the proceeds or as much thereof as may be necessary to the payment of this note, and all expenses charged. This note was signed by the sales company and the court states that every other note was like this one except as to date, amount and description of car. The court said in that case, speaking of the testimony of Nakdimen: ''While he speaks in one place of having taken a lien on the automobiles for the purchase price thereof, in another portion of his testimony, he speaks of retaining title in them until the purchase price was paid. This view of the transaction is borne out when we consider that a separate note was given for each automobile, and that it was considered a separate transaction. . . . The acts and conduct of the parties indicate that it was the intention of the bank to retain the control of each automobile until it was sold and the proceeds applied to the payment of the purchase price.''

Appellants next refer to the bankruptcy act and to the case of *Fairbanks Shovel Co.* v. *Wills,* 240 U. S. 642, 36 S. Ct. 466, 60 L. Ed. 841. In that case there was no conditional sales contract involved. The appellants claimed under a mortgage which was not valid because it was not recorded as required by the state law. The court said: ''The chattel mortgage was made, acknowledged, and recorded in Cass county, and was never either recorded or acknowledged in Cook county.

''The Circuit Court of Appeals held, affirming the district court, that the residence of the bankrupt was in Chicago, which is in Cook county, and therefore the mortgage, having never been properly acknowledged or recorded, was invalid as against the trustee in bankruptcy.''

The court further said in that case: ''Appellant's title was not perfected, as against the trustee in bankruptcy, by taking possession of the dredge under the mortgage after the filing of petition in bankruptcy and before adjudication.''

There is nothing in that case we think, that supports the contention of appellants here.

Numerous other cases by this court and others are cited by appellant to the effect that a contract retaining

title is a valid contract and it may be in writing or it may be oral. This court has said that where there is such a contract the seller may enforce his rights against the buyer or against any person to whom the buyer sells.

In this case, however, the intention was that the buyer should resell, sell at retail, the goods purchased from appellants, and it will not be contended that the original seller could retake the goods that it had authorized to be resold at retail. But in this case it is a question of fact whether there was a conditional sales contract. Certainly the statement on the invoices, not signed by anyone, would not constitute a contract. It is true the buyer might state to the seller that he agreed to those conditions, and if he did a conditional sales contract would be made orally.

We think the evidence clearly shows in this case that there was no conditional sales contract made either in writing or orally, but assuming that it was a question of fact whether there was a conditional sales contract made, this was a question to be determined by the trial court from the evidence, and under numerous decisions of this court his finding of fact is as binding as the verdict of a jury.

If the invoices containing the statements above set out had been signed by the seller, or if there had been an oral agreement, or any other kind of agreement, that the property was that of the seller and that when sold by the retail merchant the proceeds should be paid over to it, then it might be said that there was a conditional sales contract.

There is no provision in the invoices and no evidence that the proceeds from the sale of merchandise should belong to the seller. On the contrary, the evidence clearly shows that the retailer had a right not only to sell the property, but to dispose of the proceeds and was not required to turn the proceeds over to the seller.

Where a wholesale merchant sells merchandise to a retail merchant for resale, and retains title to the merchandise, the wholesaler has title when they are sold by the retailer, and of course if the wholesaler has title, the proceeds of the sale, when the retailer sells, is the

property of the wholesaler, and it is generally provided in conditional sales contracts that in such cases the retailer must account to the wholesaler for the proceeds. No such requirement was made in this case.

When all of the facts and circumstances are considered, it is our opinion that there was not a conditional sales contract entered into.

The judgments of the circuit court are affirmed.